**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JAN 10 2000**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

MATTHEW THOMPSON,

      Petitioner - Appellant,

v.

STATE OF OKLAHOMA,

      Respondent - Appellee.

No. 98-7158

E.D. Oklahoma

(D.C. No. CV-96-637-S)

---

**ORDER AND JUDGMENT**[*]

---

Before **EBEL** and **ANDERSON**, Circuit Judges, and **CROW**,[**] District Judge.

---

Matthew Thompson appeals from the district court's denial of his petition

for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.[1]  The petition asserts

---

[*]This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel.  The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

[**]The Honorable Sam A. Crow, Senior District Judge, United States District Court for the District of Kansas, sitting by designation.

[1]On April 23, 1999, this court granted a certificate of appealability as to all issues raised in Mr. Thompson's pro se brief on appeal, and appointed the Federal Public Defender for the District of Colorado to represent Mr. Thompson. Briefing was completed on September 17, 1999.  The issues raised in the petition

(continued...)

constitutionally ineffective assistance of trial counsel primarily on two grounds: an alleged failure to investigate the background of Judy Gaumond to discover evidence damaging to her credibility and a prior rape accusation; and poor interview techniques that failed to uncover and present exculpatory testimony from Ms. Gaumond's live-in boyfriend, Michael Bryan. The district court, adopting the findings and recommendations of the magistrate judge, concluded that much of the information proffered by Mr. Thompson would not have been admissible in court, and the remainder would not have changed the outcome of the trial. Accordingly, counsel was not constitutionally ineffective.

On appeal, Mr. Thompson, through counsel, reurges the claims raised below and asserts in addition that the district court erred in failing to obtain and review part of the state trial record and to hold an evidentiary hearing. Counsel asks this court to remand the case to the district court for further proceedings. In his pro se brief, Mr. Thompson contends further that the district court erred by refusing to consider affidavits submitted in the federal proceedings by seven of the twelve jurors and evidence of events involving Ms. Gaumond's behavior in years following the trial. He also argues other examples of his trial counsel's

<hr>

[1](...continued)
have been exhausted in the Oklahoma state courts, which considered the merits. Procedural bar is not an issue. The petition was timely filed pursuant to the limits imposed by 28 U.S.C. § 2244(d)(1); Hoggro v. Boone, 150 F.3d 1223, 1225 (10th Cir. 1998).

failure to investigate the facts and obtain favorable evidence and failure to press inconsistencies and errors in Ms. Gaumond's testimony and prior statements. Finally, Mr. Thompson alleges that the state trial judge was biased against him. He seeks an order directing habeas relief and a new trial in the state court. For the reasons stated below, we affirm.

## BACKGROUND

Mr. Thompson was convicted by a Pontotoc County, Oklahoma, district court jury of raping Judy Gaumond on March 17, 1991. The jury acquitted him on a charge of sodomy. On December 8, 1992, the court sentenced Mr. Thompson to fifteen years in prison. According to the state's brief, he was released on July 9, 1999.[2]

Certain facts are undisputed beginning with Mr. Thompson's admission that he had a sexual encounter with Ms. Gaumond sometime after 3:00 a.m. on Sunday, March 17, 1991, in Ada, Oklahoma. Physical contact included vaginal

---

[2]The state does not assert mootness. Presumably Mr. Thompson is on parole; thus the "in custody" requirement for a writ of habeas corpus is satisfied. See Harvey v. Shillinger, 76 F.3d 1528, 1537 (10th Cir. 1996) (citing Maleng v. Cook, 490 U.S. 488, 491-92 (1989)).

penetration by Mr. Thompson and at least digital penetration of Ms. Gaumond's rectum. The two had no previous relationship. The encounter took place on a pile of carpet in a vacant apartment to which Mr. Thompson had transported Ms. Gaumond by car. Mr. Thompson was admittedly under the influence of drugs and alcohol. No witnesses saw Ms. Gaumond and Mr. Thompson together.

At about 5:45 a.m. on March 17, 1991, two women out for an early walk came upon Ms. Gaumond walking aimlessly in the area of 10th and Broadway in Ada. Ms. Gaumond asked directions to the police station, told them she had been raped, and began crying. Officer Lynn Haines of the Ada Police Department responded to a 911 call placed by one of the women. He reported that he found Ms. Gaumond in a state of hysteria. She was bruised on the face and scraped on her neck, chest, elbows, and knees. Her shirt was torn.

Later that morning, at the police station, Ms. Gaumond tentatively identified Mr. Thompson's picture in a college yearbook and in a photo lineup. Thereafter the police arranged for Ms. Gaumond to make five tape recorded telephone calls to Mr. Thompson and to have a recorded meeting in an attempt to obtain incriminating statements. Although Mr. Thompson's conversations were probative, they were conciliatory and cautious. He did not directly admit either to rape or sodomy, but acknowledged the episode. The police then videotaped an interview with him in which he gave one version of the encounter, followed the

next day by another interview in which he recanted and confessed to another version of the facts, but not to rape or sodomy. He asserted that the encounter was consensual, and that was his defense at trial. The audio and videotapes were played at trial as part of the prosecution's case. Mr. Thompson did not testify.

The surrounding facts were contested at trial. Mr. Thompson claimed that he struck up an acquaintance with Ms. Gaumond at Hardee's restaurant around 3:00 a.m. on the 17th. She agreed to accompany him to drink beer, agreed to go to the apartment after the two stopped at a Texaco station for beer, and consented to the ensuing sexual encounter. He asserted that the two parted amicably with him dropping her off, at her request, near the apartment she shared with Michael Bryan in the 800 block of East 12th Street in Ada.

Conversely, Ms. Gaumond testified at trial that she left her apartment at 2:45 a.m. to use a payphone at a nearby convenience store to call the Pizza Hut regarding an application for employment on the evening shift. She stopped first at Hardee's restaurant, where she was an employee, for a soda, then walked to the convenience store. On the way back she was accosted by Mr. Thompson as she passed by the entrance of an alley where Mr. Thompson's car was parked. She stated that on the previous day, the 16th, Mr. Thompson and two other men had accosted her, causing her to run to a nearby residence for safety. Mr. Thompson was alone when she saw him around 3:00 a.m. He said something like "you

didn't think I would catch up with you did you bitch," then, after a few other words, forced her into his car. Tr. Vol. II at 34-35. According to Ms. Gaumond, Mr. Thompson threatened to kill her if she attempted to leave. He then stopped for beer, but she was too frightened to escape or seek help. Thereafter Mr. Thompson took her to the vacant apartment, placed her on the pile of carpet, undressed her, threatened her with a knife, raped and sodomized her anally with his penis, beat her when she screamed and struggled, and otherwise caused various injuries, including rug burns to her knees, arms, and face. After the encounter Mr. Thompson then drove her in a direction away from her apartment to the area of 6th and Constant Streets, by the railroad overpass, pushed her out of the car, and drove off. At that point Ms. Gaumond began walking back toward town where she met the two women referred to above.

The trial of this case covered three days. The state presented the testimony of five witnesses: one of the women who saw Ms. Gaumond around 5:45 a.m. on March 17th; Officer Haines who responded to the 911 call; Ms. Gaumond; Greg Frazier, an employee at Hardee's who testified that Ms. Gaumond did come in during the early morning hours, stayed briefly, and left alone; and Detective Tommy Cosper who investigated the incident and supervised the five tape-recorded telephone calls by Ms. Gaumond to Mr. Thompson, and the recorded meeting between them.

The state offered the tapes in evidence and played them to the jury. The first three taped telephone calls (Ex. 8 at trial) took place on March 26th. The taped personal meeting was the next day, the 27th (Ex. 9). Following that meeting there were two more taped telephone calls (Ex. 10).

Detective Cosper also testified that after the telephone calls, the police had Mr. Thompson come to the police station where a Detective Leewright took a statement that was videotaped by Cosper (Ex. 7). That videotape was played to the jury. Finally, Detective Cosper testified that on March 29th, the day after the videotaped interview, the police arrested Thompson and took him to the station where, after being read his rights, Mr. Thompson gave yet another statement (Ex. 14), which was audio-taped. In that statement Mr. Thompson said that he gave false information in his videotaped statement the previous day, and provided different details. That audio tape was also played for the jury. Except for brief testimony from the Hardee's employee, the testimony of Detective Cosper and the playing of the tapes took the entire afternoon on the second day of trial.

The defense, in addition to vigorous cross-examination especially of Ms. Gaumond and Detective Cosper, presented three witnesses: Christina Thompson, who testified that on the evening of March 16th she had lent Mr. Thompson her red Firebird automobile—a fact inconsistent with Ms. Gaumond's description of a yellow car; Mr. Thompson's mother, Nancy Thompson, who testified that after

-7-

March 17th she found a note under the doormat at the Thompson residence threatening Mr. Thompson; and Michael Bryan, whose testimony was presented by stipulation and consisted of an account of his evening's activities with Ms. Gaumond on March 16th.

Two years after his conviction, while his direct appeal was pending, Mr. Thompson filed a motion for a new trial based on evidence newly discovered about Ms. Gaumond, and asserting ineffective assistance of counsel. That motion was denied on procedural grounds. Thereafter, on February 21, 1996, Mr. Thompson filed an application in state district court for post-conviction relief, again asserting the grounds raised in his earlier motion for a new trial. The state district court considered the application on its merits and denied relief on April 11, 1996. The Court of Criminal Appeals also considered the claims on their merits and on May 29, 1996, it affirmed the denial of relief.

The grounds for post-conviction relief asserted in the state court are reasserted in Mr. Thompson's federal habeas petition. They rest on thirteen affidavits and statements consisting of approximately fifty pages, including exhibits. In addition, there are seven juror affidavits and the affidavit of Kevin Haley, an ex-husband of Ms. Gaumond, that are presented only in connection with the federal habeas petition.

By these affidavits Mr. Thompson seeks to portray Judy Gaumond as a thoroughly disreputable person of bad character, who is mentally and emotionally unbalanced, and a psychopathic liar with a history of false accusations of assault and other crimes, including a false accusation of rape. Mr. Thompson asserts that if his counsel had properly investigated Ms. Gaumond, he would have discovered some of this evidence and could have destroyed her credibility as a witness. Finally, through the affidavit of Michael Bryan, Mr. Thompson asserts that a newly discovered, innocent explanation exists for the injuries to Ms. Gaumond. He contends that his counsel was ineffective for failing to discover this information due to unprofessional interview techniques when questioning Bryan.

The primary focus of this case is on the Bryan affidavit, on an affidavit by Pastor Michael Haynes, and on a third affidavit given by one of Ms. Gaumond's ex-husbands, Kevin Haley. The Bryan affidavit (Ex. A to the Federal Petition) was apparently executed in Georgia, and is dated October 17, 1994, almost two years after the trial. In it Michael Bryan describes his relationship with Judy Gaumond, lasting several months. In particular he states that on the evening of March 16, 1991, he and Ms. Gaumond, who were living together at the time, drank beer and had sexual relations in the living room of their apartment. He describes the sex as rough, causing carpet burns on Ms. Gaumond's face, elbows, and knees, and that he ripped her shirt. He further describes the sex as largely

anal, but possibly vaginal as well. He also stated that Ms. Gaumond left the apartment around midnight to buy cigarettes. Finally, Mr. Bryan states his belief that Ms. Gaumond lied about being raped and gave various general instances of her bizarre behavior. Prior to trial Mr. Bryan told a different story to an investigator for the defense, and separately to the prosecutor's staff, the prosecutor, and to defense counsel. Based on those statements the defense stipulated that Bryan's testimony, if he were called, would be only that he and Judy drank beer on the evening of the 16th, played cards, watched television, then went to bed; and that Judy later went out in the middle of the night.

Dr. Michael K. Haynes was Pastor of the First Baptist Church of Mineola, Texas, from 1979 to 1982. In his affidavit (Ex. C to the Petition) he states that in 1981 or 1982 he became aware of a rape accusation by Judy (then Owens) against the church youth director. He called a meeting attended by himself, Judy, her parents, and a church staff director, concluding that "[w]e determined that Judy was not telling the truth." Haynes Aff. at 1. Apparently, Judy filed no criminal complaint and never formalized an accusation of rape. The Haynes affidavit was executed in Bell County, Texas, on November 15, 1995.

Kevin Haley executed an affidavit in Hunt County, Texas, on May 17, 1996 (Ex. Q to the Petition). As indicated above, it was not filed in any of Thompson's state proceedings. In the affidavit, Mr. Haley states that he was married to Judy

(later, Gaumond) from August 1983 to September 1984, living first in Commerce, then in Sulphur Springs, Texas. They separated in June 1984 when Judy left him and went to Oklahoma City. Mr. Haley generally but thoroughly disparages Judy's truthfulness, fitness as a mother, and capacity for normal conduct during the months they lived together, and a few contacts after that. Specifically, when Judy left him, she lied about joining the Air Force Reserve and being pregnant. Haley did not describe any false accusations of rape or assault by him or others, or any incidents of "rough" sex. He did detail one incident where Judy reported that she was being stalked. There was no official determination that this was untrue. Haley said the police stopped the man in question and later told Haley "he wasn't really a good person." Haley Aff. at 9.

Of the thirteen affidavits and statements presented first in state court, nine (Ex. D-L to the Petition) relate to events involving Ms. Gaumond that did not occur until a year or two after the case was tried.[3]

_____

[3]Six of the statements concerned Ms. Gaumond's behavior, utterances, and accusations occurring in and around her lodgings in Lawrence, Massachusetts, during the month of July 1994. (Sept. 7, 1994, interview notes with Joanne Newman, Ex. F; Aug. 24, 1994, statement of Gary S. LaGasse, Ex. G; Aug. 24, 1994, statement of Arline A. Kliska, Ex. H; Aug. 24, 1994, statement of Elaine M. Eaton, Ex. I; Aug. 24, 1994, statement of Raymond Roeger, Jr., Ex. J; Aug. 24, 1994, statement of Charlene Chapman, Ex. K). The various accusations, including accusations of assault, made by Ms. Gaumond and referred to in these statements, center around her estranged husband, Rick Gaumond, who apparently lived in another state.

(continued...)

In post-conviction proceedings the Oklahoma Court of Criminal Appeals directly addressed whether, under Oklahoma law, the Bryan and Haynes affidavits, as well as one submitted by Betty Wright,[4] constituted newly discovered evidence that warranted a new trial.

The court noted that under Oklahoma law, "[a] new trial based on newly discovered evidence will not be granted where the new evidence only tends to

_____

[3](...continued)
Another exhibit, Exhibit D, apparently filed in October 1994, asserts that Ms. Gaumond falsified her date of marriage to Rick Gaumond in divorce papers she filed in Massachusetts probably in 1993 (no date is specified). It further asserts that at the time of her marriage to Rick Gaumond on September 24, 1994, she was married to Kevin Haley. Exhibit E is an affidavit by Rick Gaumond's Massachusetts attorney, John Brien, regarding an event on August 23, 1993, in which Judy Gaumond made false accusations against Rick Gaumond for assault, breaking and entering, destruction of property, and violation of a protective order. The affidavit goes on to describe a false accusation in September 1994 that Rick Gaumond sexually molested a Gaumond child sometime between 1991 and 1993. Finally, the affidavit attaches a police arrest report charging Ms. Gaumond with disorderly conduct in June 1993. The last of these exhibits relating to post-trial events, Exhibit L, is a statement of Detective Michael Gilligan of the Andover, Massachusetts Police Department, describing an incident on March 3, 1995, in which Judy Gaumond, who had just been released from prison, made a series of accusations about Rick Gaumond. Allegedly he left a threatening note at her residence. When the officer determined that the story was fabricated, Ms. Gaumond threatened suicide.

[4]The affidavit by Betty Wright, Jeff Gaumond's mother, executed Nov. 22, 1994 in Dallas County, Texas, includes a short, general statement that Gaumond had lied, apparently during the 1980s (Ex. O to petition). The thirteenth affidavit, a Dec. 22, 1995, (no location is given) affidavit by Mack Martin, a criminal defense lawyer, gave his opinion that Thompson would have been acquitted if trial counsel had reasonably investigated Gaumond's background and cross-examined her with the evidence (Ex. B to petition).

discredit or impeach the witness for the State and where it would not change the result of the trial." R. Vol. II, Ex. C at 5-6 (Order Affirming Denial of Post-Conviction Relief, May 29, 1996). The court then ruled as follows:

> Although the district court did not specifically find that the evidence Petitioner seeks to have considered (contained with the Affidavits of Michael Bryan, Betty Wright, and Michael Haynes) was only impeachment evidence, this Court now so finds. Further, we agree with the District Court that the introduction of this evidence would not have been outcome determinative. Specifically, with regard to Michael Bryan, we find that much of the information contained within his affidavit would have been inadmissible at trial under Oklahoma's rape shield statute.

Id. at 6.

The court separately addressed the claim of ineffective assistance of counsel. Quoting findings of the state district court, the Court of Criminal Appeals stated: "The District Court specifically found that Petitioner's trial counsel was not ineffective and stated that Petitioner had failed to prove that 'but for counsel's performance, the result of the trial would have been different.'" Id. at 3 (emphasis added). The court affirmed that finding. See id. at 6.

In the appeal before us, Mr. Thompson does not raise a constitutional challenge to the Court of Criminal Appeals' denial, under state law, of a new trial based on newly discovered evidence. Rather, the central issue is whether Mr. Thompson was denied the effective assistance of counsel.

-13-

## DISCUSSION

## A.

At the outset, because of Mr. Thompson's adamant protestations of innocence, we emphasize the limited role that federal courts play in the exercise of their habeas jurisdiction. Federal habeas courts do not sit to correct errors of fact or to relitigate state court trials. Our jurisdiction is limited to ensuring that individuals are not imprisoned in violation of the Constitution. See Herrera v. Collins, 506 U.S. 390, 400 (1993).

> Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding.

Id. Here the constitutional claim is ineffective assistance of counsel.

Recently, Congress has further clarified and constrained our jurisdiction through the Antiterrorism and Effective Death Penalty Act (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (1996) (codified in relevant part at 28 U.S.C. § 2254), which the parties agree applies to this case. Section 2254(d), as amended, provides that a writ of habeas corpus

> shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly

-14-

established Federal law, as determined by the Supreme
Court of the United States; or

(2) resulted in a decision that was based on an
unreasonable determination of the facts in light of the
evidence presented in the State court proceeding.

This provision focuses on the state court's ultimate decision or resolution of the case. When, as here, the decision is on the merits, we must defer to the decision whether or not it is accompanied by supporting reasoning. See Aycox v. Lytle, 196 F.3d 1174, 1178 (10th Cir. 1999).

> Thus, we must uphold the state court's summary decision unless our independent review of the record and pertinent federal law persuades us that its result contravenes or unreasonably applies clearly established federal law, or is based on an unreasonable determination of the facts in light of the evidence presented. This "independent review" should be distinguished from a full de novo review of the petitioner's claims. See Delgado, 181 F.3d at 1091 n.3. Our review is in fact deferential because we cannot grant relief unless the state court's result is legally or factually unreasonable.

Id.

Our decision in Aycox is significant due to Thompson's argument that the AEDPA does not apply to an evaluation of the adequacy of his counsel's performance because the state courts provided no reasoning on the point. See Appellant's Supp. Op. Br. at 23-24. He asserts that we owe no deference to the Oklahoma decisions and must conduct a de novo review. See id. at 40. We need not resolve this issue. The Supreme Court presently has the statute in question under consideration. See Williams v. Taylor 163 F.3d 860 (4th Cir. 1998), cert.

granted, 119 S. Ct. 1355 (Apr. 5, 1999) (No. 98-8384).  Accordingly, we emphasize that under our analysis the outcome of this appeal would be the same under any standard of review.

**B.**

Mr. Thompson asserts that he was denied the effective assistance of counsel guaranteed by the Sixth Amendment.  To demonstrate ineffective assistance of counsel a defendant must show defective performance and prejudice. See Strickland v. Washington, 466 U.S. 668, 687 (1984).  To show ineffective performance, he must prove that counsel's errors were so serious that counsel "was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  Id.  Next, a defendant must show that "counsel's errors were so serious as to deprive the defendant of a fair trial."  Id.  That is, the defendant must demonstrate that, but for counsel's errors, the outcome of the proceedings would have been different.  See Kimmelman v. Morrison, 477 U.S. 365, 375 (1986).  We "may address the performance and prejudice components in any order, but need not address both if [petitioner] fails to make a sufficient showing of one."  Foster v. Ward, 182 F.3d 1177, 1184 (10th Cir. 1999).

A fair assessment of attorney performance requires a reviewing court "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of

counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689. "To be ineffective, the representation must have been such as to make the trial a mockery, sham, or farce, or resulted in the deprivation of constitutional rights." Dever v. Kansas State Penitentiary, 36 F.3d 1531, 1537 (10th Cir. 1994); see also Hoxsie v. Kerby, 108 F.3d 1239, 1246 (10th Cir. 1997) (holding that to be constitutionally ineffective, counsel's performance must have been "completely unreasonable, not merely wrong").

As indicated above, in support of his ineffectiveness claim, Thompson focuses on three individuals and their affidavits: Michael Bryan, Pastor Michael Haynes, and Kevin Haley. In his pro se brief, Mr. Thompson also argues that the juror and post-trial event affidavits also establish his right to relief. We address these arguments in turn.

### 1. **Michael Bryan**

More than three and a half years after the incident in question, and almost two years after trial, Michael Bryan, Ms. Gaumond's live-in boyfriend, stated, for the first time, a possible alternative explanation for Ms. Gaumond's injuries. In his affidavit, he asserts that on the evening of March 16, 1991, he and Ms. Gaumond had "very rough" sex, causing her face, elbows and knees to become

red from carpet burns. Bryan Aff. at 2. He also states that he possibly ripped her shirt.

Prior to trial the defense identified Mr. Bryan as a potential source of Ms. Gaumond's injuries, listed him as a witness, and sent an investigator, Pamela Hoffman, to interview him. In that interview Mr. Bryan said nothing about sex or injuries, describing activities on the evening in question as being limited to having some beer, playing cards, watching television and going to bed. See Tr. Vol. III at 186. He refused to describe Ms. Gaumond as drunk. In his affidavit, Mr. Bryan says this account was untruthful, but that he gave this untruthful account to Ms. Hoffman because, "I was embarrassed to tell of the details of our sex life with my parents there and still felt some odd sense of loyalty to Judy." Bryan Aff. at 4.

Mr. Thompson claims that his counsel was constitutionally ineffective because his investigator, Pamela Hoffman, acted unprofessionally when she interviewed Bryan in front of his parents, allegedly causing him, out of sensitivity, to hide the truth. See Appellant's Supp. Op. Br. at 25. There are a number of problems with this claim. As Thompson acknowledges, Pamela Hoffman was not the only one to speak with Mr. Bryan about testifying at trial. George Butner, Thompson's defense counsel, separately spoke with Bryan prior to putting on the defense case. See Tr. Vol. III at 8. The prosecutor, Chris Ross,

-18-

sent someone to speak to Mr. Bryan prior to trial. See id. at 9. And, Mr. Ross personally spoke to him during the trial. See id. at 11. In all three of those additional interviews, Bryan adhered to the story he told Hoffman, see id. at 9-11, and expressly denied that he caused any of Ms. Gaumond's injuries. See id. at 9 ("He denied putting any of the injuries."). As a result of these multiple contacts with Bryan, in which he consistently spoke only of beer, cards, television and his going to sleep, defense and government counsel stipulated to Bryan's testimony. The court read the stipulation to the jury. See id. at 23, 34.

Bryan's affidavit does not mention any of these additional contacts in which he told the same story, presumably when his parents were not present and when he had multiple opportunities privately to disclose the facts he alleges several years after the event. Furthermore, if sensitivity about what his parents would think caused him to be untruthful with Pamela Hoffman in her interview at the home, there is no reason to believe he would have been less reticent in front of his parents and, essentially the whole town, in court.

Additionally, Bryan's affidavit says he was less than truthful for an additional reason: loyalty to Ms. Gaumond. This reason stands on its own. Nothing in the Bryan affidavit suggests he was willing at that time to become disloyal under any circumstances.

Finally, the Bryan affidavit critically omits any statement or suggestion that he was ready to tell a different story at the time of trial, or at trial, if questioned differently, or by someone else, or was called to the stand. And, it omits any reason why he withheld crucial evidence from everyone—apparently telling no one—until October 1994.

Eliminating the distorting effects of hindsight and evaluating counsel's challenged conduct from his perspective at the time—as the Supreme Court requires—we cannot conclude that counsel's performance was completely unreasonable. And, there is no showing on this component of the Strickland test sufficient to require a hearing.

### 2. Pastor Michael Haynes

Michael Haynes was pastor of the First Baptist Church of Mineola, Texas, from 1979 to 1982. As indicated above, in an affidavit dated November 16, 1995, Pastor Haynes states that in 1981 or early 1982 Judy (then, Owens) "had accused my youth director of rape." Haynes Aff. at 1. Pastor Haynes called a meeting attended, apparently, by five people: himself, a church staff member, Judy's parents, and Judy. At the meeting "we determined that Judy was not telling the truth, and dismissed the accusations as false." Id. No other facts are offered. There is no way to compare the alleged circumstances with what happened

involving Mr. Thompson about ten years later. Ms. Owens apparently made no formal charge, no report to the police, or sought any medical attention.

Even if admissible or probative, the record is bare of any assertion as to how or why Thompson's counsel in Ada, Oklahoma, could or should have found out about this private church matter, occurring eleven years before trial, in another state, in a town about 200 miles away, especially when Pastor Haynes was living elsewhere after 1982. His affidavit was executed in Bell County, Texas, several hundred miles further south.

Thompson's argument is that he is entitled to an evidentiary hearing on the subject because the state failed to argue "that Mr. Thompson had not shown deficient performance," and there is "every indication" Haynes could have been located in 1992 for trial. Appellant's Supp. Op. Br. at 32. This argument fails to take into account that the burden is on Thompson to show deficient performance, and the "every indication" assertion is not supported with a single factual allegation.

On this record, using the same standards referred to above, we cannot conclude that counsel's performance was constitutionally deficient for failing to locate Pastor Haynes or discover this incident. Furthermore, there is an insufficient showing to create an entitlement to an evidentiary hearing.

### 3. Kevin Haley

Kevin Haley's affidavit, executed in May 1996, was not submitted to the state courts. There is no reason why, in our analysis of the state court proceedings, we should take it into consideration, especially since the state courts have not had an opportunity to pass on evidentiary and admissibility questions raised by the affidavit. However, even if we did, it would not resolve the ineffectiveness issue in Mr. Thompson's favor. Mr. Haley was married to Judy (Gaumond at the time of trial) from August 1983 to September 1984, but they only lived together for about 10 months. Their first residence was in Commerce, Texas, then Sulphur Springs, Texas, where Mr. Haley continued to reside.

The affidavit is full of generalized personal judgments and statements about Judy's character and alleged habits regarding untruthfulness, with two concrete examples being lies around the time she left Haley that she was pregnant and had joined the Air Force Reserve. There are no instances of rape accusations or rough sex. All of the material is attenuated in time from the years in question, 1991 to 1992.

Thompson cites to no persuasive state authority that would suggest that testimony like Haley's would be proper, relevant, or not outweighed by its prejudicial effect. Rather, he cites the trial judge's discretionary authority to admit evidence, and argues ineffectiveness for not giving the judge a chance to

rule.  See Appellant's Supp. Op. Br. at 35-37.  We note that the trial judge has the discretion to exclude remote character evidence.  See Joffe v. Vaughn, 873 P.2d 299, 304 (Okla. Ct. App. 1993) (upholding trial court's discretion to exclude evidence "too remote in time and relevance"); Stouffer v. State, 738 P.2d 1349, 1355 (Okla. Crim. App. 1987) (ex-wife's knowledge of victim's drinking habits "was too distant [after living apart for fifteen months] to establish a then current pattern of . . . conduct or to be relevant, or to qualify as impeachment evidence").  We conclude on our own review that if any part of the proffered material would have been admissible at this rape trial it would have been so insignificant as to have had no probable effect on the outcome.  The core facts are unaffected: Thompson's concessions that he instigated the encounter; Ms. Gaumond and he were not acquainted; he was deeply under the influence of valium, marijuana and alcohol; Ms. Gaumond was injured, including bruises, scratches and scrapes; she immediately reported that she had been raped; and she was distraught, crying and hysterical.

More to the point, on the performance prong of Strickland, our conclusion is the same as that with Bryan and Haynes.  While Haley, an ex-husband, would certainly have been a more logical investigation target than Haynes, there are several missing factors in Thompson's equation.  The most obvious objects of an investigation into Ms. Gaumond's life would have been Bryan, her current

-23-

boyfriend, and Rick Gaumond, her husband since September 1984. We have reviewed the Bryan situation. Thompson does not inform us about Rick Gaumond's availability or lack thereof in 1991 and 1992, or what helpful and admissible information he had. Haley, then, is three tiers removed in relationship, up to eight years removed in time, and hundreds of miles distant in another state. And, Thompson's counsel had no reason from Bryan, Rick Gaumond, or anyone else, to believe that locating Haley would be helpful. In short, Haley and his views were attenuated in time, place, circumstance, and directly relevant subject matter. While Thompson's counsel might have done better, applying the standards referred to above, we cannot conclude from our own examination of the record that counsel's performance fell below constitutional standards where Haley is concerned.

### 4. Juror Affidavits and Post-Trial Events

In these federal proceedings Thompson presented affidavits from seven jurors, almost four years after the trial, saying that they had read "the affidavits attached to Mr. Thompson's brief in Support of Petition in Error" filed in the Court of Criminal Appeals and with all that information they would have decided Thompson's case differently. Ex. P to the Petition. Contrary to Thompson's assertion in his brief to us, see Appellant's Op. Br. at 15-16; Ex. P, there is no

-24-

indication that the jurors only read the Bryan and Haynes affidavits and every indication that they read more, including a good deal of information that, in any case, would not have been admitted at trial.

Regardless, we agree with the magistrate judge that the rules of civil procedure, Supreme Court authority, and binding precedent in our own circuit preclude consideration of such affidavits.  See Fed. R. Civ. P. 606(b); Capps v. Sullivan, 921 F.2d 260, 262 (holding that evidence that jurors would have voted differently is inadmissible in federal habeas corpus proceedings); cf. Tanner v. United States, 487 U.S. 107 (1987).

Mr. Thompson also argues in his pro se brief that we should consider the nine affidavits relating to events that had not even occurred at the time of trial. In the context of an ineffectiveness of counsel issue, they are obviously inappropriate since the events and witnesses were not available in 1992.

## C.

Mr. Thompson's overarching contention is that the district court erred by deciding this case without having and reviewing Thompson's two taped interviews with the police on March 28 and 29, 1991, plus exhibits showing Ms. Gaumond's injuries, among other things.  Indeed, Mr. Thompson suggests that we and the district court are powerless to make a decision on the habeas petition

without these items.  See Appellant's Supp. Op. Br. at 41-42.  He also argues that the district court had a duty to obtain the missing portions of the record on its own initiative.  See Appellant's Supp. Reply Br. at 4.  These arguments are directed at determinations on the prejudice prong of Strickland, and the premise that the state trial transcript and other materials that the district court did have in this case, all of which the magistrate judge summarized in his findings and recommendation, were insufficient.

As indicated above, our judgment is, in its essentials, based on the performance component of Strickland and our independent review of a record entirely sufficient for that purpose.  Furthermore, we reject the proposition that the district court has a legal duty, sua sponte, to obtain these specified parts of a state trial record.

Thompson also alleges that the district court erred in failing to grant an evidentiary hearing on his claim.  In Miller v. Champion, 161 F.3d 1249 (10th Cir. 1998), we held that the AEDPA's restriction on evidentiary hearings[5] does not apply where "a habeas petitioner has diligently sought to develop the factual basis underlying his habeas petition, but a state court has prevented him from doing so."  Id. at 1253.  Thompson claims that because the state courts denied his request for a hearing, his petition falls within this Miller exception such that the

---

[5]See 28 U.S.C. §§ 2254(e).

AEDPA restriction does not apply. However, Thompson is not entitled to a federal evidentiary hearing under any standard. Even if the denial of a state hearing did prevent him from developing his factual claims, he still fails the less restrictive standard: a petitioner is "entitled to receive an evidentiary hearing so long as his allegations, if true and if not contravened by the existing factual record, would entitle him to habeas relief." Id. at 1253.

As discussed above, we conclude that Thompson has not made a sufficient threshold showing to entitle him to an evidentiary hearing. See Trice v. Ward, 196 F.3d 1151, 1159 (10th Cir. 1999); Foster v. Ward, 182 F.3d 1177, 1184 (10th Cir. 1999). Therefore, we conclude that the district court did not err in denying a hearing.

### D.

In his pro se brief, Mr. Thompson claims a miscarriage of justice and actual innocence. His argument is not that his innocence has been established, such as by a recantation by Ms. Gaumond, but that he would stand a better chance of acquittal now. That does not pass the test for fundamental miscarriage. See, e.g., Clayton v. Gibson, No. 98-5154, 1999 WL 1256322, at *4 (10th Cir. Dec. 22, 1999).

He also argues the trial record inconsistencies in Ms. Gaumond's statements and testimony (car and personal identifications, convenience store stop, no knife or employment application, etc.). These state no constitutional claim and in any event, were argued to the jury by Mr. Thompson's counsel. Thompson raises other arguments, including bias by the trial judge, that we decline to review because he failed to raise the issues below. See Lyons v. Jefferson Bank & Trust, 994 F.2d 716, 720 (10th Cir. 1993) (federal appellate courts do not consider issues not raised below). However, even if we did review these arguments, Thompson could show no constitutional violation.

## CONCLUSION

Although we base our decision in large part on other grounds, supported by the record, see Bath v. National Ass'n of Intercollegiate Athletics, 843 F.2d 1315, 1317 (10th Cir. 1998), we hold that the district court did not err. Accordingly, the judgment of the district court is AFFIRMED.

ENTERED FOR THE COURT

Stephen H. Anderson
Circuit Judge